George Andrews, J.,
delivered the opinion of the Court.
James Galvin was indicted in the Criminal Court of Memphis, for the murder of John Eenton. He was convicted of murder in the first degree, and sentenced to be hung; and has appealed in error to this Court. A number of questions arise upon the record in the case.
It is claimed, that the record does not show that the grand jury was impaneled of "good and lawful men.” The record shows, that the members of the grand jury were "duly elected, impaneled, sworn, and charged,” and that, in our view, is sufficient. They having been elected and impaneled under the direction of the Court, it must be presumed that they were good and lawful men: McClure vs. State, 1 Yerg., 215.
It is claimed that the Court erred in directing the sheriff to summon a panel of 57 men, for the election of the traverse jury, including the regular, panel of 19 jurors, and that the prisoner was entitled to have the *286 full panel of 57 summoned, excluding the regular panel in attendance. There was no error in this. We see no objection to th'e practice; it is not prohibited, and is in accordance with common practice in such cases.
On the motion for a new trial, the defendant filed the affidavit of A. J. Collins, one of the jurors, who tried the cause, to the effect, that, though he assented to the verdict of “guilty of murder in the first degree/’ his judgment and conscience did not approve the verdict; that he assented in consequence of a large majority of the jurors being in favor of such a verdict, because of an earnest desire to be discharged, and under the belief that, upon such a verdict, the Court could fix the punishment, either by sentence of death, or by imprisonment; that since he has learned that the Court, upon the verdict rendered, had no discretion as to the punishment, his “judgment and conscience” do not approve the verdict; that he believed and now believes, that the defendant “was guilty of one or the other grades of homicide, but that he does not approve the Verdict inflicting the highest penalty, as the evidence in the case, in his judgment, did not, and now docs not, justify such verdict.”
The Court had distinctly instructed the jury, as appears by the bill of exceptions, that the punishment for murder in the first degree is death, unless the jury should find that there were mitigating circumstances in the case, and should incorporate the same in their verdict; and it is difficult to see how the juror could have misunderstood the matter. The affidavits of two other jurors were read, showing that the subject of a *287 recommendation to mercy was discussed by the jury, that they were charged and understood that, without such recommendation the Court had no power to commute the punishment; and that Collins, though at first in favor of such recommendation, yielded the point, and agreed to the verdict rendered.
The affidavit of Collins shows that he agreed to a verdict of murder in the first degree, supposing that it would be in the power of the Court to sentence the prisoner either to death or imprisonment, and only dissented when he found that the Court had no such discretion. It is not charged that the juror was led to assent to the verdict by any unfair means — that there was any fraud, misrepresentation, coercion, or undue influence. Collins’ affidavit is far from being a consistent or a sensible one. If we would be justified in any case, in permitting the affidavit of a juror, that he had misunderstood the charge of the Court, which appears plainly and distinctly in the bill of exceptions, I do not think we would be justified in so doing in this case: 4 Humph., 518.
In Crawford vs. State, 2 Yerg., 60, it was held to be ground for new trial, that it was shown, by the affidavits of two of the jurors, that they were not satisfied of the guilt of the prisoner, but had assented to the verdict of guilty with a recommendation to mercy, upon the belief that the Governor would certainly pardon the defendant, and that there could be no doubt of a new trial being granted.
In Nelson vs. State, 10 Humph., 518, 533, the affidavits of five of the jurors were received, showing that *288 they were induced to believe, from tlie arguments of their fellow-jurors, that if they found a verdict of guilty, with a recommendation to mercy, the Court could adjudge a punishment short of death, and that they would never have consented to the verdict if they had not so believed. The Court had no such discretion in that case; but the action of the Court itself, as well as other circumstances, led the jury to believe that the power existed. The Court say: “We do not think that a verdict ought to stand when the life of a human being is involved, which has been rendered under the influence of such manifest misconceptions of the legal effect of it; especially where these misconceptions have been produced and fortified by the action of the Court.”
I do not think that either of the above cases goes far enough to justify this Court in granting a new trial upon the affidavit produced in the present case. And we are not disposed to extend the rule in favor of granting new trials upon such affidavits, any farther than it has been carried by former decisions of this Court.
The main facts sufficiently established by the evidence, are as follows: On the 25th of December, 1867, about twelve or one o’clock in the day, the defendant, Galvin, with two other men, named respectively, Connell and McGrain, were in company in the City of Memphis, and either Connell or Galvin, the evidence being conflicting as to which of the two it was, knocked down' and injured a colored man there present. The negro went to seek a policeman, and soon returned with Fenton, the deceased, who was a *289 policeman of the city of Memphis, then on duty, and in uniform. Fenton endeavored to arrest Connell, and a severe conflict ensued, in the progress of -which Fen-ton was knocked down in the gutter. I. D. Jones testified, that while Fenton was down, Connell was over him, and Galvin had hold of him. Fenton got up, and he and Connell struggled to the middle of the street. Galvin drew his pistol, and said no body should arrest him, or Connell, witness did not know which. Chamberlin, another policeman came up; and Fenton said, “arrest that man.” Chamberlin went for Galvin, who drew his pistol and Chamberlin did not take him. Mr. Jones testified, that two or three men were struggling with Fenton, and got him down in the gutter. Fenton got up and struggled across the street. Galvin had his pistol out and swore that whoever attempted to arrest them, he would shoot. Cham-berlin came up, and some one said to him, “arrest that man;” Galvin waved his pistol and said the first man that attempted to arrest him, was a dead man.
I. PI. Chamberlin, the policeman, testified that he came up while Fenton was engaged in the scuffle with Connell. Galvin had his pistol in his hand, and said, that any “man that arrested that man, Fll shoot.” Mrs. Chamberlin testified, that Fenton was .thrown down in the gutter; he got up and struggled out into the street, and was again thrown down; and while he was down, Galvin kicked at his head, but just then his head was thrown or pressed down, and the blow went over his head. Before they got done the scuffle, Chamberlin came up, and Fenton said, “arrest that *290 man.” Chamberlin started to arrest Galvin, who had his pistol out and presented it. Chamberlin had nó pistol, and did not make the arrest. Galvin pushed Chamberlin back and said, if he attempted to arrest him, he would be a dead man. Chamberlin searched for his pistol, and Galvin said to him, “if you go for your pistol you are a dead man.”
It further appears, that Fenton having got clear from Connell and McGrain, started across the street towards Galvin, who had turned to go away, saying to Galvin as he did so, “I want you.” Galvin, who had his pistol 'in his hand, stopped, turned and presented his pistol at Fenton who was advancing towards him, and said, “don’t you come any nearer, or I’ll shoot you.” Fenton continued to advance, having his hand in his bosom, but no pistol drawn. At Galvin’s threat he stopped, and Galvin said, “you go for your pistol and I’ll shoot.” Fenton drew his pistol, and as he was cocking it, Galvin fired at him, the ball grazing his person, and killing a boy behind him. Galvin fired one or two shots, and then Fenton fired. Each fired several shots, and by one of those fired by Galvin, Fenton was killed. Two of defendant’s witnesses testified that Fenton fired first, but this testimony is contradicted by such an amount of testimony, as to be incredible.
The principle ground of defense relied upon in this case, is, that the killing of Fenton was committed by Galvin, in the defense of his person against an assault or unlawful arrest, and therefore, must be held to have been either justifiable homicide, or manslaughter.
*291 Tlie evidence clearly shows, that Fenton at the time of the killing, was attempting to arrest the defendant. If Fenton had no right to make such arrest, under the circumstances proven in this case, he was guilty of an assault, which the defendant had the right to resist. And though the defendant in such case had no right, unless he had reason to believe that he was in immediate danger of death, or of great bodily harm, to take the life of the officer, the provocation of the unlawful arrest, might be sufficient to reduce the offense to the grade of manslaughter: 2 Whart., Am. Cr. Law, secs. 981, 1034-7; Tackett vs. State, 3 Yerg., 392.
The doctrine has sometimes been stated without qualification, that homicide, committed in the act of resistance to an illegal arrest, will be manslaughter, and not murder. Manslaughter is the unlawful killing of another without malice, either express or implied. Where the homicide is shown to have been committed on sudden quarrel, and in the heat of blood, the law making a concession to human infirmity, refuses to imply the malice, which would, under other circumstances, be presumed from the use of the deadly weapon, and “mercifully hesitates to put on the same footing of guilt, the cool deliberate act, and the result of hasty passion.”
But where no adequate provocation exists, or where no passion or heat of blood results, the willful slayer cannot extenuate his cool, deliberate act of killing by the pretence that he had a right to be in a passion.
The law recognizes the sacredness of the right of *292 personal liberty, and jealously guards it from violation. It recognizes the fact, that an invasion of that right may be, and often is, the most aggravated provocation. But the only effect to be given to the fact that the killing was in resisting an illegal arrest, rests upon the proven or presumed provocation; and the law does not arbitrarily reduce to the grade of manslaughter every, homicide which may be committed in the act of such resistance, without reference to the presence or absence of actual malice and deliberation.
An unlawful arrest, made bona fide under color of legal authority, is a trespass, and like other trespasses, it may, or may not, in the particular case, constitute an aggravated provocation. And the mere fact that the officer or citizen attempting the arrest, and being slain in so doing, has exceeded his authority, does not necessarily reduce the killing to manslaughter, if the slayer had no reason to believe himself in imminent danger of life, or great bodily harm, and the homicide were, in fact, perpetrated, not in passion or sudden heat, upon the provocation of the arrest, but with cool, deliberate malice and premeditation: 1 Archb. Cr. Pr. and Pl., 7 ed., 865; Whart. Amer. Law of Homicide, 64.
But the law does not allow that a lawful arrest is a provocation to passion and heat of blood. And, if the officer had the right, under the circumstances proven, to make the arrest, and was engaged, using no more force than was reasonably necessary, in accomplishing it, then the killing of him by the defendant would -be murder; and the faet that the killing was in *293 the heat of blood caused by a lawful arrest, would not reduce the offense to the grade of manslaughter.
The provisions of the Code in regard to arrests, are substantially in affirmance of the common law, and are as follows:
Sec. 5037. “An officer may, without a warrant, arrest a person: First, for a public offense committed, or a breach of the peace threatened in his presence.”
Sec. 5038. “When arresting a person, the officer shall inform him of his authority and the cause of the arrest, and exhibit his warrant, if he have one, except when he is in the actual commission of the offense, or is pursued immediately after an escape.”
Sec. 5040. “If, after notice of the intention to arrest the defendant, he either flee or forcibly resist, the officer may use all necessary means to effect the arrest.”
By the Metropolitan Police Law, of 1866, under which the police of the City of Memphis were appointed, it is provided that, “the several members of the police force shall have power and authority to immediately arrest, without warrant, and to take into custody, any person who shall commit, or threaten or attempt to commit, in the presence of such member, or within his view, any breach of the peace, or offense, directly prohibited bjr Act of the Legislature, or by any ordinance of the city, etc.” And it is by the same Act declared to be their duty to preserve the public peace, prevent crime, detect and arrest offenders, suppress riots, protect the rights of persons and property, enforce every law relating to the suppression and punishment of crime, or to disorderly persons, etc.
*294 The Code prohibits the carrying of deadly weapons:
Sec. 4753. “No person shall publicly ride or go armed to the terror of the people; or privately carry any dirk, large knife, pistol, or any other dangerous weapon, to the fear or terror of any person.”
Sec. 4757. “No person shall, either publicly or privately, carry a dirk, sword-cane, Spanish stiletto, belt or pocket pistol, except a knife, conspicuously on the strap of a shot pouch, or on a journey to a place out of his county or State.”
A breach of the peace is “a violation of public order, the offense of disturbing the public peace. An act of public indecorum is also a breach of the peace.” Bou-vier Law Diet.
It is urged for the defendant, that Fenton had no right to arrest Galvin on the occasion in question, because Galvin, as alleged, had not at the time of the attempted arrest, committed any public offense, or threatened any breach of the peace, in the presence of the officer.-
It would seem that, strictly, Fenton had no right to arrest either Connell or Galvin, without a warrant for the offense of striking the negro, the assault not having been committed in his presence. » And the person sought to be arrested, had the right to resist such arrest with a degree of force proportioned to the emergency, but not to kill the officer in so doing, unless he had reason to believe that he was in imminent danger of death, or of great bodily harm. The attempt to arrest a person in violation of law may afford such provocation to the person arrested as to reduce the kill *295 ing from murder to manslaughter; but tbe killing is still unlawful, and a felony. If tbe attempted arrest be unlawful, tbe party sought to be arrested, may use such reasonable force, proportioned to tbe injury attempted upon him, as is necessary to effect bis escape, but no more; and be cannot do this by using or offering to use a deadly weapon, if be has no reason to apprehend a greater injury than a more unlawful arrest.
Tbe evidence plainly shows, that, while tbe struggle in tbe street was going on, Galvin wras not under arrest, but was himself assaulting tbe officer, with the design to aid Connell. Whether the attempted arrest of Connell was lawful or unlawful, Galvin had no right to interfere and assault the officer by striking or kicking him, or by the use of a dangerous weapon. Gal-vin’s only right was to preserve, by proper means, his own person from unlawful arrest, or to use sufficient force to prevent an affray, or separate the combatants. He had not the right to interfere for the assistance or rescue of Connell, who stood in no relation to him justifying such interference, by assaulting the officer, or displaying deadly weapons.
By this interference of Galvin in aid of Connell, by assaulting the officer, and by drawing his pistol in the public streets, and publicly threatening to shoot any one who should attempt to arrest him or Connelly Galvin was guilty of actual as wrell as threatened breach of the peace.
He was guilty of a violation of the law of the State and of a breach of the peace, in being there, publicly armed with a pistol, and in assaulting and threatening the life of Chamberlin therewith.
*296 For these violations of law and public order, committed in his presence, Fenton might lawfully arrest him, and it was clearly his duty to do so.
The evidence, and Galvin’s declarations that he would shoot any man that attempted to arrest him, showed that Galvin knew that Fenton’s object was to make the arrest; and, if not, Fenton’s calling to him and saying, “I want you,” was sufficient notice. His uniform and club were sufficient notice, under the circumstances, of his official character, if the other circumstances in evidence left, as they clo not, any doubt as to Galvin’s knowledge upon that point: Lewis vs. State, 3 Head, 148.
Every murder perpetrated by means of poison, lying in wait, or by any other kind of willful, deliberate, malicious, and premeditated killing, is murder in the first degree. “Premeditation involves a previously formed design, or actual intention to kill. But such design or intention, may be conceived, and deliberately formed in an instant. It is not necessary that it should have been conceived, or have pre-existed in the mind, any definite period of time anterior to its execution:” Lewis vs. State, 3 Head, 148. The evidence of deliberation and premeditation in this case, was undoubtedly sufficient to authorize the verdict of murder in the first degree.
We are unable to discover any error or defect in the charge of the Court, to the prejudice of the defendant.
The judgment must be affirmed.