## WILLIAM POTEETE *v.* THE STATE.

1. CRIMINAL LAW. *Bail. Surety. Clerk's power to arrest defendant.* A clerk of the court is not authorized to direct the arrest of a defendant where he has been released on giving security, or to direct his imprisonment in the county jail as a means of collecting a judgment rendered against him and his surety.
   Code cited: Sections 5166, .5329.

2. SAME. *Resisting arrest. Office and officers.* A *mitimus* issued by the clerk of a court improperly and in violation of law, and directing the sheriff to arrest and imprison the party named, will not justify the officer in attempting to make such arrest; and the resistance of the party by killing the officer does not amount to murder. The officer must at his peril see that he has valid process in his hands to authorize an arrest.

3. SAME. *Evidence. Severance. Competent witness.* A party jointly indicted for the same offense, but who has obtained a severance, and is not put on joint trial, is a competent witness for defendant.
   Cases cited: Delozier *v.* State, 1 Head, 46; Rice *v.* State, 1 Yer., 432.

4. SAME. *Same. Dying declarations.* The dying declarations of a witness to a homicide are not admissible in evidence. Only such are admissible as are made by him for whose homicide the prisoner is on trial.
   Case cited: Hudson *v.* The State, 3 Col., 359.

### FROM MADISON.

Appeal from the Law Court. H. W. McCORRY, Judge.

S. W. HAWKINS, J. R. HAWKINS and M. M. BRIGHT for plaintiff.

ATTORNEY-GENERAL HEISKELL for the State.

FREEMAN, J. delivered the opinion of the court.

Poteete was indicted and convicted in the common law and chancery court of Madison county, for killing Jason Fussell, a deputy sheriff, in March, 1877. The jury found him guilty of murder in the second degree, and fixed his punishment in the penitentiary for sixteen years. Motions for a new trial and arrest of judgment were made, and overruled, and appeal in error to this court. Several questions are presented in argument on which reversal of this judgment is asked, which we proceed to notice, so far as may be necessary for the decision of the case before us. A short statement of facts will serve to show the bearing of the questions to be decided.

It seems that the defendant, together with his two brothers, John and Levi Poteete, had been convicted, and fines imposed on them, for the offense of carrying pistols in violation of law. They gave their father, Andrew Poteete, as surety for payment of these fines and the costs of the prosecutions; and on these judgments executions were issued by the clerk, and placed in the hands of Perkins, sheriff, who is assumed to have put them in the hands of Fussell, the deceased, for collection. On the back of these executions, which are in the usual form, is endorsed the fact that they are "alias" executions. In addition to the above process, we find on the other side of them, what is entitled a "*mitimus*," which commands the sheriff to take the body of the parties and safely keep them in custody n the county jail, until the amount of the judgments in.

each case shall be paid. This process is signed by the clerk of the court, and in fact is issued without any order or judgment of the court whatever, so far as we can gather from the record. In addition to the above papers, there had been issued to the sheriff a capias against the body of Jno. Poteete, one of the brothers, for a misdemeanor in carrying a pistol, based on a presentment therefor, made by the grand jury of Madison county. This process is also assumed to have been in the hands of the deceased deputy sheriff, Fussell. It appears that about the third day of March, 1877, Fussell went to the house of Andrew Poteete, the father, accompanied by his nephews, William and John Anderson, who had been summoned by him as a *posse*, to assist him in arresting the parties named. Without detailing the circumstances attending the transaction, it suffices at present to say, that Fussell assumed to arrest the three sons, and it is equally clear, that in doing so, he assumed to arrest them all then by virtue of the process to which we have referred. It may further be assumed, that, as he had a capias, or is claimed to have had one, against John Poteete, that his individual arrest was probably by virtue of that—at any rate, for the purposes of this opinion, may be assigned to that process. This, however, as a matter of course, could be no authority for the arrest of the defendant on trial, and we are compelled to decide the question as to the effect of these so-called *mitimuses*, in the hands of the deputy sheriff, as conferring no authority on him to arrest and detain the defendant in custody. We need but say here,

that the parties having been charged only with a misdemeanor, and that not committed in the presence of the officer, he could not arrest them without process of law authorizing such act, and to do so without this, would be a trespass, a wrong of greater or less degree, dependent on the attendant circumstances in the particular case.

On the subject of the authority of the deputy sheriff to make the arrest, his honor below charged the jury substantially, that if Fussell went to the house where the prisoner and the other persons named as defendants in such *precepts* were, for the purpose of apprehending them, such act on the part of Fussell and those with him was a lawful act, and if he informed them and the others of his purpose, and commanded them to submit to arrest, and they made no question upon the authority or the precepts, but apparently submitted to the arrest, and acted so as to induce Fussell to believe that they did not desire or care that the precepts be exhibited, it was not necessary that he should exhibit them, and the parties under such circumstances would have been under lawful arrest, and it was unlawful in them by any means to resist him; and if, after such submission, the prisoner, for the purpose of escaping, deliberately or premeditatedly shot at and killed the said Fussell, he is guilty of murder in the first degree.

It is obvious from this extract, taken as a whole, that his honor assumed the validity of the precepts we have referred to, as giving authority to Fussell to arrest the defendant, and in fact all the parties against

Poteete *v.* State.

whom he had such precepts. He makes no distinction between the case of John Poteete, against whom the capias issued, and the other parties against whom, at most, he had no precept, except the so-called *mitimus*. We must decide the question, then, whether there were legal and valid precepts, which conferred authority on the officer to arrest the defendant. While we would go far towards justifying an officer in the *bona fide* performance of his official duty, in obedience to an apparent warrant issued by a proper officer, and would hold, that no mere technical or formal objection should be allowed to prevent his being shielded from the charge of an unauthorized aggression, yet, on the other hand, we must remember, that the rights and liberties of a citizen can only be invaded by due process of law. In view of these considerations, as well as long settled principles, we are compelled to hold that, if the precept in the hands of the officer be unauthorized by law, not issued by authority of an officer authorized to issue it, he attempts to execute it at his peril. Mr. Greenleaf, vol. 3, sec. 123, lays down the rule as follows: "Thus, the killing will be reduced to manslaughter, if it be shown in evidence that it was done in the act of protecting the slayer against an arrest by an officer acting beyond the limits of his precinct, or by a warrant essentially defective in describing either the person accused or the offense—or when the party was, on any other ground, not legally liable to be arrested or imprisoned."

While we perhaps might not go to the full extent of the doctrine here stated, as to objections to the

warrant for want of description of the person or the offense, still it is evident we could not fail to go as far as we have stated, consistent with authority and sound principle; that is, that the precept held by the officer must be issued by one authorized by law, and must be a legally authorized process, empowering the party to take and imprison the party, or else it cannot justify the act on the part of the officer. This must be so on sound principle. For, assuming that a process is necessary in order to legal action, it can only be such process when issued by and in accordance with the authority conferred by law. To hold otherwise, would be to assume that for this purpose an unauthorized precept would be as effective as one directed by the law of the land. It will not do to say that it is hard to impose on a mere ministerial officer the duty of deciding upon the validity in law of the process issued to him. This must be done, as to the matter indicated, by some one, and as an officer of the law he may be assumed to have better means of doing so than the citizen who is to be arrested. At any rate, we see no great hardship in the rule we have laid down as applicable to this case, that the officer must see that he has a process in his hands, issued by authority of law, and by an officer authorized to give him such a mandate. In view of these principles, we must test the correctness of the charge of his honor. It clearly appears, that the party had been convicted and fined by the court. By sec. 5329 of the Code, it is provided, "that where a fine is imposed, the court may allow the defendant to confess

Poteete *v.* State.

judgment for the fine and costs, with good sureties."
By the next section it is provided, "if the fine and
costs are not paid, or the judgment confessed, as pro-
vided in the preceding section, the defendant shall be
imprisoned until the fine and costs are paid, or he is
otherwise discharged by law. It is then provided,
the clerk shall issue execution for the fine and costs,
or any portion of the same remaining unpaid, as in
civil cases. These sections clearly mean, that if the
defendant gives the sureties as required, he shall not
be imprisoned, and that the sureties stand in the place
of personal confinement as a means of enforcing the
collection of the penalty imposed, and the party dis-
charged from custody; and such has been the uniform
practice in our courts. This being so, the judgment
of the court was proper, that execution should issue
against the defendants and surety to collect the amount
thus secured. But we can see no statute or rule of
law, by which the clerk is authorized, notwithstanding
the party has been released on giving surety, to direct
his arrest and imprisonment in the county jail as a
means of collecting the judgment rendered against him
and his surety. What might be the power of the
court when it had been legally shown that insufficient
or insolvent security had been given, or whether the
court might not treat insufficient security as no security,
and thereupon order the defendant rearrested, and held
until he gave good and sufficient sureties, or was dis-
charged according to law, we do not determine. In
cases of bail, it would seem some such doctrine is laid
down by the authorities, cited in note to sec. 5166.

of the Code.    But this has no application to the case
now before us.    We are compelled to hold, that the
clerk had no authority to issue the *mitimus* in this
case, and that being issued without authority of law,
and by an officer not having authority to direct the
arrest and imprisonment of the defendant, such process
could not give the protection of legal process to the
officer attempting to execute it, and in so holding his
honor erred.

There are other questions proper to be decided, as
the case will go back for another trial, and they will
likely be presented again.    First, whether Levi Po-
teete was a competent witness for defendant, he being
jointly indicted with him for the same offense, but
having been permitted to sever before the trial, and
therefore not on trial with him.    On this question,
we concede, on the general current of authority, the
competency of the witness.    We find, however, this
principle cited in Philips on Evidence, with a *quere*,
as to its soundness, based on the suggestion that the
attorney-general might, by jointly indicting material
witnesses, withhold evidence from the defendants.    In
fact, it is pretty clear that the rule was, probably,
originally transferred inadvertently into the criminal
law, by analogy with the common law technical rule,
that no party to the record should be a witness in
the cause.    It is thus referred to in a case of our
own as a technical rule in 1 Yer., 432;  see also, 1
Phil. on Ev., 89, notes.    In the case of *Delozier* v.
*The State*, 1 Head, 46, where a party jointly indicted
and found guilty, was offered as witness on the trial

of the other party, and rejected by the court below, this court, reversing the judgment, said: "Although there is some conflict of opinion upon the point, it is difficult to perceive any sound reason why, in a case like the present, one of several defendants, jointly indicted, but tried separately, should be held incompetent as a witness, either before or after trial and conviction, for a co-defendant. His relation to the trial may justly affect his credibility more or less, according to the circumstances of the particular case; but we are at a loss to see any just ground upon which he should be excluded as positively incompetent." In fact, none exists, except in the mere technical rule to which we have referred. The result of the trial can have no influence on his own case, nor can the record be used as evidence either for or against the witness. Why should he be held incompetent? It is conceded by the attorney-general that this court has held the wife of such a party competent, and this stands on precisely the same principle.

In view of these authorities, we agree with the opinion cited, and hold the witness competent; this rule being the only one standing on any sound legal principle, so far as we are able to see, and the one generally recognized as settled, since the above decision in our State.

The next question is, whether it was proper to allow the dying declaration of Jno. Poteete, who was engaged in the difficulty, and was killed by a shot from one of the Andersons, to the effect, that he fired but one shot, thus tending to fix the killing of Fus-

sell on the defendant or his brother, as he received several fatal shots from some of the parties. We find the authorities are contradictory on this question, the earlier cases allowing such testimony, even in civil cases, as the dying declarations of a subscribing witness to a bond or a will that the papers were forged. See Phil. on Ev., vol. 1, top p. 232, also notes. This has long been overruled, and the author says, p. 233: "That dying declarations have been limited even in criminal cases; and the rule is now, that such declarations are generally admissible only where the death of the declarant is the subject of inquiry, and where the circumstances of his death are the subject of his dying declarations." The learned editors of Philips, in note to the above, says that so long as such testimony stood on the idea alone that the situation of the party, as near dissolution, was equivalent to the obligation of an oath, no reason could be given why such declarations should not be received in other cases as well as that of homicide. But he adds, "on the whole, it is plain, that the rule is one of policy and necessity arising in the particular case. It shall not be allowed to the offender to commit a homicide, and by the same act put to silence the only witness at whose mouth he may be condemned." He then adds: "Upon this view it has long been settled, by a series of cases, that declarations *in extremis* are restricted to the trial for the identical homicide which occasioned the death of the person who makes the declaration."

This court, in the case of *Hudson* v. *The State*, 3

Col., 359, approve this as the rule. Upon careful reflection we can see no reason to depart from it, nor why any extension of the rule should be made. Such testimony is subject to many objections and inherent infirmities. The party is not in condition, frequently, to give calm attention to the question to which he makes his statement. It is usually made in the presence of friends whose feelings are excited against the other party against whom they are to be used, and who may easily direct the dying man's attention to the points in the case bearing most heavily on the guilt of the accused, and who will most naturally leave out of view all that tend to a different view. The accused is not present, and has neither an opportunity to make suggestions or call attention to the circumstances in his favor, nor to cross-examine to show inaccuracies of memory, or expose bias from passion or prejudice.

In view of these considerations, we are satisfied the rule laid down by the authorities cited is the sounder and safer one, and that the principle on which the admissibility of such testimony should mainly rest, is the one stated, of policy, and to prevent the party from depriving the State of testimony by his own murderous act. We therefore conclude, there was error in the admission of these declarations of John Poteete against the prisoner.

There are several other questions debated before us, but if they involve error, as probably some of them do, they are not likely to occur again, being questions of competency of jurors, who are alleged to have

formed and expressed opinions as to the guilt or innocence of the prisoner. For the errors of law herein discussed, the case must be reversed. We express no opinion whatever on the facts of the case, but leave them to be sifted by a future jury on the next trial; and we do not think it proper that we should, in the slightest, bias that investigation by any view we might have of the testimony found in the record. It is sufficient that we find errors of law against the prisoner. It is an imperative duty to correct them, and remand the case for a new trial, which is done.