Hurd v. State.

## WILL HURD *v.* STATE.*

### (*Knoxville.* September Term, 1907.)

1. **CRIMINAL LAW. No authority to arrest without warrant for a misdemeanor not committed in the officer's presence.**
   An officer has no authority to arrest one without a warrant for the misdemeanor of unlawfully carrying a pistol, or for other misdemeanors, not committed in his presence, but the commission of which is communicated to him by others. (*Post, pp.* 591-593.)

   Code cited and construed:     Sec. 6997 (S.); sec. 5863 (M. & V.); sec. 5037 (T. & S. and 1858).

   Code cited and approved:     Pesterfield v. Vickers, 3 Cold., 215.

2. **SAME. Killing in resisting arrest by one without notice of his official character is manslaughter or in self-defense, when.**
   Where one kills an officer attempting to arrest him, and there is nothing from which the official character of the officer can be inferred, the offense is reduced to manslaughter, though the officer had power to make the arrest; and where a person is placed in a position in which his life is imperiled by the act of another, having no notice of the official character of the latter, and the killing is apparently necessary to save his own life, the homicide is committed in self-defense, though the officer was legally seeking to arrest the accused. (*Post, pp.* 591-597.)

   Case cited and approved:     Note in Keady v. People, 66 L. R. A., 353, 387.

3. **SAME. Charge erroneous as to want of knowledge of official character of the arresting officer, and lawfulness of arresting for a misdemeanor without a warrant.**
   Where, on a trial for the murder of an officer while attempting to arrest the accused who killed the officer in resisting such

---

*As to homicide in resisting arrest, see note to Keady v. People (Colo.), 66 L. R. A., 353.

Hurd v. State.

arrest, there was a conflict in the testimony on the questions (1) whether the accused knew that the deceased was an officer and was attempting to arrest him, and (2) whether a third person said to the deceased: ."Shoot the ——; he has got a gun," the failure to charge that the want of knowledge of the official character of the deceased and his purpose to make the arrest might, if the other facts warranted it, reduce the homicide to manslaughter, and the giving of a charge that the officer might make the arrest for a misdemeanor not committed in his presence, with or without warrant, accompanied by a charge that the material inquiry was whether the deceased was attempting to make a lawful arrest, and if he was, and while in the discharge of his duty, using no more force than was reasonably necessary, the accused killed him he would be guilty of murder, constituted reversible error. (*Post, pp.* 588-597.)

FROM HAMILTON.

Appeal in error from the Criminal Court of Hamilton County.—S. D. MCREYNOLDS, Judge.

HOWELL TITUS, for Hurd.

ASSISTANT ATTORNEY-GENERAL FAW, for State.

MR. JUSTICE MCALISTER delivered the opinion of the Court.

The prisoner was convicted in the criminal court of Hamilton county for the crime of murder in the first degree, with the judgment of death, for the unlawful killing of one T. O. Musgrove. The deceased was a policeman of the city of Chattanooga, but at the time of his death was dressed in citizen's clothes, and it does not distinctly appear that the prisoner knew at that time the deceased was a police officer. The theory of the state is that Musgrove at the time of his death was attempting to arrest defendant, Hurd, for the offense of unlawfully carrying a pistol.

The shooting, which resulted in the death of Musgrove a few hours later, occurred about 9 or 9:30 o'clock p. m., on White street, in South Chattanooga, near the saloon of one E. L. Shepherd. This saloon was situated on the corner of Whiteside and White streets, fronting on the east side of Whiteside street and running back along the north side of White street. There are large glass doors in the front of the saloon, and at the rear end of the building there was a door leading from the back room of the saloon out into White street. The saloon was divided by a partition into two rooms, and the front room was known as the white bar, and the rear room as the colored bar; but there seems to have been an indiscriminate mixing of the whites and blacks at each of these bars. Witnesses testified that this saloon was the usual loafing place of Musgrove, the deceased, when

he was off duty. At the time of the tragedy, deceased
was off duty, and had been around the saloon for some
hours, sitting in the back room with some white men
and some negroes; and it is stated by the barkeeper, a
State's witness, that Musgrove was endeavoring to sober
up, as he was expecting to go on duty the same night.
Among other persons in the back room with deceased
were J. D. Drennan, who, the barkeeper says, had been
drinking, but was also sobering up. The prisoner went
into Shepherd's saloon about half or three-quarters of an
hour before the shooting. It is shown he remained in
the front room, and did not go back to the rear room,
where the deceased was; and it does not appear that
deceased and the prisoner saw each other until the meet-
ing in the street at the time of the shooting.

While the prisoner was in the front room, the bar-
keeper, Culver, treated defendant a time or two, and the
defendant treated Culver to drinks or cigars. The pris-
oner took four or five drinks, and during the conversa-
tion, according to the witness Culver, the prisoner was
"telling them in there about the deputy sheriffs and
police, and said that he always got on very well with the
deputy sheriffs and police, but when one went to arrest
him he is going to get the contents of my gun." And in
a few minutes he said, "I can't tell you anything about
white men, but I can tell you all about a nigger, and I
ain't got half time to tell you about them." It seems
that in a few minutes Shepherd, the proprietor of the
saloon, who was an intimate friend of the deceased, and

who had been in the back room with the deceased while the conversation between the prisoner and the barkeeper and others occurred in the front room, came into the front room and began to check up his cash register. The prisoner, who knew Shepherd, asked him to "set 'em up." Shepherd declined. The prisoner then asked Shepherd to take a drink with him, or, as the barkeeper testified, the prisoner said, "If you are going to be short about it, I will set 'em up," and remarked to Shepherd, "I have been trading here with you over two years," to which Shepherd replied, "I don't give a d——n if you have; I am not going to set 'em up, and if you don't like it you can just get out of my place," to which the defendant replied, in substance, "All right, Mr. Shepherd; I will get out of your place—I am as good a man as any man," and started towards the door. As the prisoner passed out of the front door to Whiteside street, Shepherd, the proprietor of the saloon, threw a glass at him, which struck the door facing and crashed, without striking the defendant. Culver, the barkeeper, testified that immediately thereafter he saw the prisoner out on the sidewalk with a pistol in his hand. Thereupon the barkeeper seized a pistol from behind the bar, and, covering the prisoner, said to him, in substance, "If you shoot in here you are a dead nigger," and thereupon the prisoner started around the corner down Whiteside street eastward in the direction of his home.

As already stated, there was a door leading from the rear room of the saloon out into White street. As the

prisoner disappeared around the corner, going into White street, Culver, the barkeeper, passed through the partition door into the rear room of the saloon, and there stated to Musgrove, the deceased, that a fellow had gone around the house with a gun, and to go out and catch him. Thereupon Musgrove, the deceased, turned and went out of the back door of the saloon opening on White street, while Culver, the barkeeper, went out the front door leading into Whiteside street. Culver was accompanied by the witness W. R. McIntosh, a nephew of the deceased, and Drennan, who was sitting in the rear room with Musgrove, followed Musgrove out the back door. Musgrove intercepted the prisoner about the edge of the street car track, and immediately seized him, when a struggle ensued.

There is testimony tending to show that, as Musgrove approached the deceased, Drennan, who was following Musgrove, exclaimed, "Shoot the ———; he has got a gun." About this time the prisoner raised his pistol and fired two shots at Drennan, both of which took effect, one in the body and the other in the arm or hand. After shooting Drennan, the prisoner turned his pistol on Musgrove, shooting him three times. Extricating himself from the grasp of Musgrove, the prisoner ran from the scene, followed closely by Musgrove, who in the meantime had drawn his own pistol and emptied it at the prisoner, while the latter was running, but none of his shots took effect. The prisoner having escaped, Musgrove reloaded his pistol and returned to the saloon, but

was soon carried to his own home, where he died a few hours later.

The prisoner admits that he knew Musgrove, at least by sight; but he states that he had never seen him except in a policeman's uniform. In this connection, as already stated, Musgrove was in citizen's clothing and was not wearing the uniform of a policeman.

It should be stated that the killing occurred in the night, between 9 and 9:30 o'clock; but there was an electric light at the corner of Whiteside and White streets, and it was a moonlight night. The evidence, however, is undisputed that Musgrove, the deceased, had a policeman's star under his coat. Culver and Musgrove, who were standing at the northwest corner of the saloon at the corner of Whitside and White streets when the tragedy occurred, both testify that when Musgrove seized the prisoner, and before the shooting, Musgrove threw back his coat, showing his badge, and saying to defendant: "Consider yourself under arrest. I am an officer of the law." It is due the defendant to say that he denies that he heard this statement, or that he saw the star, or that he recognized the deceased.

The theory of defendant is that, when Shepherd threw the glass at him as he emerged from the door of the saloon, he was excited and alarmed, and immediately ran around the corner of Whiteside street and started directly home. He denies that he drew his pistol in front of the saloon on Whiteside street. The evidence is uncontradicted that the prisoner, after passing out of the sa-

loon on Whiteside street, left the scene of the difficulty, turned down White street, and was proceeding in the general direction of his home, and was so proceeding when the deceased, accompanied by Drennan, ran out of the back door of the saloon on White street and seized the prisoner. It appears that, when the deceased and Drennan emerged from the saloon, the prisoner attempted to avoid them and went into the middle of the street. His theory is that he did not know that Musgrove was an officer, and believed that the approach of these parties was for the purpose of continuing and following up the assault which had already been made upon him in the saloon. He claims that this belief was based upon the fact that two men followed him around the corner of Whiteside street from the front room of the saloon, and two men emerged from the rear room through the door on White street.

The defendant, it should be stated, proved a good character. Mr. A. F. Gustafson, proprietor and manager of the Gustafson Manufacturing Company, testified that defendant had been in his employ almost continuously for three years immediately preceding the homicide, and that his general character for peace and quiet in the community was excellent; that his general reputation for truth and veracity among the shopmen was very good, and from that general reputation he would give him full faith and credit on his oath in a court of justice. Three other witnesses testified to the good character for peace and truth of the prisoner. The State in-

troduced no witnesses attacking his general character.

An examination of the record has satisfied us that there was a conflict in the testimony upon two material questions of fact: (1) Whether defendant knew, or the circumstances were such as necessarily to fix him with knowledge, that deceased was an officer and was attempting to arrest him; and in this connection whether deceased threw back his coat, and showed his policeman's star, and said to defendant, "Consider yourself under arrest; I am an officer of the law." (2) Whether Drennan said to Musgrove, the deceased, as he left the door and advanced toward defendant, "Shoot the ——; he has got a gun." In view of this conflict in the testimony, the object of the persons who were advancing upon the defendant was a very material inquiry in the case, as it would illustrate the mind of the defendant as to his apprehensions of danger.

We are of opinion, in view of the facts disclosed in this record, that the trial judge was in error in charging the jury as follows:

"If T. O. Musgrove, deceased, was a policeman in the city of Chattanooga at the time he was killed, and direct information was brought to him that defendant, Hurd, had a pistol on his person, it was his duty, as well as his lawful authority, to arrest said Hurd, with or without a warrant; and as to whether or not he was in uniform would be immaterial. According to the State's theory of this case," continued the court, "It is immaterial as to who was in fault in the difficulty in the

saloon, or as to what occurred therein. The material question for you to inquire, according to their theory, is: Was Policeman Musgrove, at the time he was killed, attempting to make a lawful arrest? And, if he was, and while in the discharge of his duties, using no more force than was reasonably necessary, the defendant, Hurd, refused to be arrested, and killed Policeman Musgrove, then he would be guilty of murder."

Now, as already stated, we are of opinion that these instructions present reversible error in this record. The theory of the State was that the deceased, Musgrove, was attempting to arrest the prisoner for the offense of unlawfully carrying a pistol, which offense is not a felony, but a misdemeanor, under our statute.

Section 6997, Shannon's Code, provides: "An officer may, without a warrant, arrest a person (1) for a public offense committed, or a breach of the peace threatened, in his presence; (2) when the person has committed a felony, though not in his presence; (3) when a felony has in fact been committed and he has reasonable cause for believing the person arrested to have committed it; (4) upon a charge made upon a reasonable cause of a commission of a felony by the person arrested."

So, in view of our statute, it was held, in *Pesterfield v. Vickers*, 3 Cold., 215, "that a police officer of a city or town cannot arrest for an offense against the ordinances of the city, unless the offense was committed in his presence, without first obtaining a warrant, unless the person arrested is guilty of a felony."

Hurd v. State.

It is clear from the record that the deceased was attempting to arrest the defendant for a misdemeanor which was not committed in his presence; but the fact of its commission was communicated by others, and the instruction of the trial judge that deceased had lawful authority to arrest defendant without a warrant was erroneous.

But, in addition to this erroneous statement of the law, the court instructed the jury that whether or not he (Musgrove) was in uniform would be immaterial. The instruction, we think, ignored the main defense of the prisoner—that at the time of the homicide he was not aware of the official character of the deceased.

In Wharton on Homicide (2d Ed.), section 403, it is said:

"Where an officer or his assistant is killed in the resistance of an arrest, it is a material inquiry, in determining the criminality and degree of the homicide, whether the party resisting arrest had knowledge or notice of the official character of the officer and of his purpose to exercise official authority. If there is no such knowledge or notice, the homicide cannot be more than manslaughter, unless the resistance was in enormous disproportion to the threatened injury. And where one kills an officer attempting to arrest him, if there is nothing from which the official character of the officer can be inferred, the measure of his offense descends from murder to manslaughter. And this is the rule, though

the officer had power to make the arrest without a warrant, where he was required by statute, in executing the warrant, to make known the authority. And the rule that it is murder to kill a human being without authority of law, when it is done in the commission of an act dangerous to others and evincing a depraved heart, regardless of human life, though without a premeditated design to effect the death of any particular person, is not applicable to a case in which the accused was suddenly accosted by a crowd of armed men demanding his immediate surrender. So, if a person is placed in a position in which his life is imperiled by the act of another, having no notice of his official character, and the killing is apparently necessary to save his own life, it is homicide in self-defense, though the deceased was legally seeking to arrest him; the accused not knowing, or having reasonable grounds to know, that he was an officer. But, though it is the duty of an officer to give notice of his intention to arrest before doing so, the person sought to be arrested may not lawfully resist or kill his assailant until all other means of peaceably avoiding the arrest have been exhausted. And the omission of the officer to exhibit his warrant or declare his authority can do no more than deprive him of the protection which the law affords him in the rightful discharge of his duty, and does not justify the person sought to be arrested in killing him, if the apparently illegal arrest can be otherwise resisted. And the question of the knowledge of the person sought to be arrested of the

official character of the person seeking to arrest him in such case is one of fact for the jury."

In a learned note to the case of *Keady* v. *People,* 66 L. R. A., 353, 387, it is said:

"In case of an unlawful arrest, or attempt to arrest, killing the person attempting it is, as a general rule, manslaughter only. A person seeking unlawfully to arrest another is a trespasser, and the trespass is a ground of provocation sufficient to reduce the homicide of such person in resistance of the arrest from murder to manslaughter, though it is not so reduced unless the person sought to be arrested actually acted under the influence of hot blood induced by the provocation. And such an attempt unlawfully to arrest gives the person sought to be arrested a right to resist, even to the extent of killing his opponent, if such killing is necessary to save himself from serious bodily harm; but the necessity must have been real and apparent.

"The amount of force which he may use in self-defense, however, is that only which is necessary to prevent the carrying out of the unlawful purpose. If excessive force is used in making resistance, the right of self-defense is eliminated, and killing by means calculated to cause death, with knowledge that the intent was only to arrest, is murder; and an unintentional killing in making such resistance, by means not calculated to cause death, is manslaughter."

We think these excerpts enunciate the correct rule of law applicable in such cases. It will be observed that

the trial judge wholly fails to instruct the jury that want of knowledge of the official character of the officer and his purpose to make the arrest might, if the other facts warranted, reduce the grade of homicide from murder to manslaughter, but, on the other hand, committed affirmative error in instructing the jury that the officer might make an arrest for a misdemeanor not committed in his presence, with or without a warrant, and it was an immaterial inquiry whether or not the deceased was in uniform. This error was intensified by the instruction given in the immediate context wherein he stated that: "The material inquiry was whether Policeman Musgrove, at the time he was killed, was attempting to make a lawful arrest. If he was, and while in the discharge of his said duties, using no more force than was reasonably necessary, the defendant, Hurd, refused to be arrested, and killed Policeman Musgrove, then he would be guilty of murder." The court had already instructed the jury what constituted a lawful arrest, and that it was not necessary that the officer should have a warrant to arrest for a misdemeanor not committed in his presence; and that charge was followed by the instruction that if the officer, in effecting such an arrest, used no more force than was reasonably necessary, and the defendant killed him, then he would be guilty of murder. If the arrest was unlawful, then the grade of the homicide might be reduced from murder to manslaughter, depending on the other facts and circumstances of the case. This phase of the case was not presented to the

Hurd v. State.

jury in the charge of the court; but, on the other hand, the court committed affirmative error in charging that the arrest was lawful.

For the error in the charge, the judgment is reversed, and the cause remanded.