RAYMOND A. LONG, Plaintiff-in-Error,

*v.*

STATE OF TENNESSEE, Defendant-in-Error.

443 S.W.2d 476

(*Knoxville*, September Term, 1968.)

Opinion filed June 27, 1969.

C. FRANK DAVIS, Morristown, for plaintiff-in-error.

GEORGE F. McCANLESS, Attorney General, ROBERT F. HEDGEPATH, and PAUL JENNINGS, Assistant Attorneys General, Nashville, and HEISKEL H. WINSTEAD, District Attorney General, Rogersville, for defendant-in-error.

MR. JUSTICE HUMPHREYS delivered the opinion of the Court.

Long was convicted of murder in the second degree and sentenced to serve not more than twenty years in the State Penitentiary. He appealed his conviction to the Court of Criminal Appeals, where it was reversed by that Court, particularly on authority of *Poteete v. State,* 68 Tenn. 261. We granted certiorari because we thought under the facts the law of the case was best stated in *Galvin v. State,* 46 Tenn. 283, and that though the case had to be retried, it should be tried in accordance with the law as there stated.

For a full statement of the facts of the case, both for the State and defendant, reference is made to the Court of Appeals opinion. It is sufficient for the purpose of this opinion to state, that it was the theory of the State that on the night in question a posse of some eight law officers went to Long's home to arrest him on a warrant charging him with the misdemeanor of assault and battery. That they arrived there late at night, and identified themselves by calling out who they were and their purpose in being there. That this announced purpose was met by promises and threats on Long's part that he would kill anyone who entered his house and sought to arrest him. That the officers then forced an entrance by kicking open the back door and entering. That the lead officer had a flashlight in one hand with which he illumined Long standing at the foot of his bed with a shotgun, and a pistol in the other. Upon this forceful entry, Long announced he was about to shoot, at which the lead officer lurched to the ground coincidental with Long's shot. And that as he fell to the floor, the pistol the lead officer had in his hand fired. That Long's shot killed the second officer, and in the immediate interval following this, the other two officers made their escape from the house. After this some shots were exchanged between the posse and Long, following which Long surrendered.

It was a part of the State's theory that Long knew that his night callers were peace officers, knew some of them personally, and was on friendly terms with at least one of them, the man who was killed. That there was no reason or excuse for Long's action except general malice and ill will.

Briefly, the defendant's theory of the case was that he and his wife and two other parties, one a woman,

had been drinking at his house earlier in the evening. That he and his wife had had an argument into which the other woman joined, at which he slapped her. That the other two parties left, and he went to bed. That he was aroused by a noise and by his wife telling him of a commotion at the back door. Long's testimony on this matter is as follows:

"Q. Now then, after you went to sleep just tell the jury here what you first knew or became conscious of?

A. Well, my wife went back there, come back there to wake me up and said somebody was breaking the door down, well, I just grabbed—I had my gun there right beside of my bed.

Q. Were there any lights on in your home at that time?

A. No sir, we left the front—back porch light on.

Q. Now where was the gun located?

A. Just right to the right at the side of the bed.

Q. Did you have a gun rack there, sir?

A. Yes sir.

Q. Now, just tell the jury what happened.

A. Well, at the time I got up and just slide down on the bed I retched for my gun, the door they'd broke through, and they flashed the light in my eyes and they was a shot and then I fired.

Q. Did you know who you were firing at?

A. No sir, I didn't.

Q. Now then, just tell the jury what happened after that.

A. Well, I was in such a shock that all the shooting started and I don't know what happened. My wife she was crying and said, I'm shot, and the plaster and glass was flying all over the house and I just don't know what happened, I fell in behind the bed and I told her to stay down on the floor or she'd get shot.'' Vol. II, Tr. pp. 114-115.

Although Long didn't know it at the time, it being his testimony and theory he did not even know his night callers were peace officers, the arrest warrant the officers were attempting to serve, although it described the offense of assault and battery and charged Long therewith, had not been sworn to by the prosecuting party before the magistrate issuing it. The magistrate had made it out in full except for the signature of the affiant, and had turned it over to a peace officer, who carried it to another place where the affiant attached her signature. So, as held by the Court of Criminal Appeals the warrant was void.

On these facts, it was the theory of defendant Long that the void warrant was no justification for the trespass that deceased, in company with the other peace officers, committed, and that under all of the circumstances he was warranted in resisting the night assault upon his home and upon himself to the extent employed.

The trial judge submitted the case to the jury on instructions concerning self-defense, but with respect to the validity or invalidity of the warrant and the consequences thereof he instructed the jury,

''You have heard some testimony concerning a charge of assault and battery set out in a paperwriting, designated a State's warrant. You will not consider whether

it was technically valid or invalid. You may consider such testimony as explanation of the presence of the deceased and other officers at the scene if it does so explain that.''

It was on account of this instruction, that the Court of Appeals reversed, citing from *Poteete v. State,* supra. And, while it unquestionably was not so intended, the effect of what was said in this part of the Court of Criminal Appeals opinion leaves the inference that any slaying of a peace officer with a void warrant may be justified, and is never more than manslaughter. This is not the law in Tennessee.

■ The law in Tennessee on these issues is best stated in *Galvin v. State,* 46 Tenn. 283, 290-292, as follows:

''The principal ground of defense relied upon in this case is, that the killing of Fenton was committed by Galvin, in the defense of his person against an assault or unlawful arrest, and therefore, must be held to have been either justifiable homicide, or manslaughter. [291] The evidence clearly shows that Fenton at the time of the killing, was attempting to arrest the defendant. If Fenton had no right to make such arrest, under the circumstances proven in the case, he was guilty of an assault, which the defendant had the right to resist. And though the defendant in such case had no right, unless he had reason to believe that he was in immediate danger of death, or of great bodily harm, to take the life of the officer, the provocation of the unlawful arrest, might be sufficient to reduce the offense to the grade of manslaughter: 2 Whart., Am. Cr.Law, secs 981, 1034-7; *Tackett v. State,* 3 Yerg., 392.

''The doctrine has sometimes been stated without qualification, that homicide, committed in the act of

resistance to an illegal arrest, will be manslaughter, and not murder. Manslaughter is the unlawful killing of another without malice, either express or implied. Where the homicide is shown to have been committed on sudden quarrel, and in the heat of blood, the law making a concession to human infirmity, refuses to imply the malice, which would, under other circumstances, be presumed from the use of the deadly weapon, and 'mercifully hesitates to put on the same footing of guilt, the cool deliberate act, and the result of hasty passion.'

"But where no adequate provocation exists, or where no passion or heat of blood results, the slayer cannot extenuate his cool, deliberate act of killing by the pretense that he had a right to be in a passion.

"The law recognizes the sacredness of the right of [292] personal liberty, and jealously guards it from violation. It recognizes the fact, that an invasion of that right may be, and often is, the most aggravated provocation. But the only effect to be given to the fact that the killing was in resisting an illegal arrest, rests upon the proven or presumed provocation; and the law does not arbitrarily reduce to the grade of manslaughter every homicide, which may be committed in the act of such resistance, without reference to the presence or absence of actual malice and deliberation.

"An unlawful arrest, made *bona fide* under color of legal authority, is a trespass, and like other trespasses, it may, or may not, in the particular case, constitute an aggravated provocation. And the mere fact that the officer or citizen attempting the arrest, and being slain in so doing, has exceeded his authority, does not necessarily reduce the killing to manslaughter, if the slayer

had no reason to believe himself in imminent danger of life, or great bodily harm, and the homicide were, in fact, perpetrated, not in passion or sudden heat, upon the provocation of the arrest, but with cool, deliberate malice and premeditation: 1 Archb.Cr.Pr. and Pl., 7 ed., 865; Whart. Amer. Law of Homicide, 64." 46 Tenn. 290-292.

Again in *Hurd v. State*, 119 Tenn. 583, 108 S.W. 1964, this Court cited with approval the following note in 66 L.R.A. 353, 387, as follows:

"In case of an unlawful arrest, or attempt to arrest, killing the person attempting it is, as a general rule, manslaughter only. A person seeking unlawfully to arrest another is a trespasser, and the trespass is a ground of provocation sufficient to reduce the homicide to manslaughter, though it is not so reduced unless the person sought to be arrested actually acted under the influence of hot blood induced by the provocation. And such an attempt unlawfully to arrest gives the person sought to be arrested a right to resist, even to the extent of killing his opponent, if such killing is necessary to save himself from serious bodily harm; but the necessity must been have real and apparent.

"The amount of force which he may use in self-defense, however, is that only which is necessary to prevent the carrying out of the unlawful purpose. If excessive force is used in making resistance, the right of self-defense is eliminated, and killing by means calculated to cause death, with knowledge that the intent was only to arrest, is murder; and an unintentional killing in making such resistance, by means not calculated to cause death, is manslaughter." 119 Tenn. 595, 108 S.W. 1068.

Unquestionably, the instruction given to the jury with respect to the warrant was harmful error against the defendant. Likewise, the State was entitled to have the jury instructed in accordance with the general tenor of the quotations above.

The State urges the Court to apply the doctrine of *Corlew v. State,* 181 Tenn. 220, 180 S.W.2d 900, and fix the punishment as though for voluntary manslaughter. This cannot be done. In *Corlew* the trial was free from error, except the punishment was fixed for grand larency, in the absence of proof of value of the goods. So, the court simply applied the statute penalty to the facts established in a fair and otherwise error free trial.

But, having found positive harmful error committed against the defendant in the present case, the *Corlew* doctrine cannot be applied.

The result is, that the judgment of the trial court is set aside and the case is remanded for a new trial in accordance with this opinion.

BURNETT, CHIEF JUSTICE, and DYER, CHATTIN and CRESON, JUSTICES, concur.